IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>vs.<br><br>CHRISTOPHER T. ST. JOHN, and RICHARD J. NASLUND,<br><br>Defendants. | **8:19CR234**<br><br>**FINDINGS AND RECOMMENDATION** |

This matter is before the Court on the Motion to Suppress filed by Defendant Christopher St. John ("St. John") (Filing No. 25) and the Motion to Suppress filed by Defendant Richard Naslund ("Naslund") (Filing No. 27). A joint evidentiary hearing was held regarding the motions on October 23, 2019. A transcript of the proceedings has been filed and this matter is now ripe for disposition.

For the reasons explained below, the motions will be denied.

## FACTS

On May 30, 2019, at approximately 5:00 p.m., Nebraska State Patrol Trooper Michael Lassen ("Trooper Lassen") observed a truck stopped in the middle of the roadway near the intersection of Highway 11 and West Cedar Road, just outside Wood River, Nebraska. (TR. 71; TR. 95.) Trooper Lassen stopped his cruiser and found St. John sitting inside the stopped truck. (TR. 71.) This encounter was recorded by the camera on Trooper Lassen's cruiser. (TR. 72; Ex. 3.)

Trooper Lassen made contact with St. John and asked him what was going on. (Ex. 3.) St. John indicated his brake shaft went out and that he could not move the truck. (Ex. 3.) St. John indicated his "brother" left on foot to get help.[1] (Ex. 3.) Trooper Lassen asked St. John his name and asked for his license. (Ex. 3.) Trooper Lassen asked St. John if he had any weapons. (Ex. 3.) St. John indicated he had a knife in his pocket. (Ex. 3.) Trooper Lassen then asked St. John where his brother had gone. (TR. 73-74; Ex. 3.) St. John responded by pointing off in a direction. (TR. 73-74; Ex. 3.)

Trooper Lassen asked St. John if he could pat him down for weapons. (Ex. 3.) St. John responded he could and put his hands in the air. (TR. 76-77; Ex. 3.) After the pat down, Trooper Lassen told St. John he was going to run his license to make sure he did not have any warrants. (Ex. 3.) Trooper Lassen left St. John standing at the back of his truck, not handcuffed, while he ran his license. (Ex. 3.)

After checking St. John's license, Trooper Lassen approached St. John and returned it. (Ex. 3.) St. John tried to start the truck again but was unsuccessful. St. John then asked Trooper Lassen if he could help push the truck. (Ex.) Trooper Lassen agreed to do so. (Ex. 3.) St. John indicated he was on medication for his shoulder. (Ex. 3.) St. John stated he was taking hydrocodone. (Ex. 3.) Trooper Lassen asked St. John if the hydrocodone was the prescription bottle in the center console of the truck. (Ex. 3.) St. John indicated it was another medication for his shoulder, which he did not like taking. (Ex. 3.) At this point, Trooper Lassen attempted to push the truck, but it did not move. (Ex. 3.)

St. John gave Trooper Lassen permission to search the truck. (Ex. 3.) Trooper Lassen asked St. John to stand off to the side of the truck as he searched it. (Ex. 3.) During the search, Trooper Lassen located a substance he thought to be methamphetamine. (TR. 76.) After finding the substance, Trooper Lassen placed St. John in handcuffs and told him he was being detained. (TR. 76-77; Ex. 3.) Trooper Lassen testified that, at that point, St. John was being detained so he could retrieve the substance from the truck and conduct a field-test on the substance. (TR. 77.)

---

[1] St. John later indicated that the individual he was referring to was not literally his brother, but rather someone he had known his whole life. (Ex. 3.)

Once St. John was in handcuffs, Trooper Lassen indicated to St. John the substance looked like methamphetamine. (Ex. 3.)

St. John then made a comment to Trooper Lassen about his brother. (Ex. 3.) Trooper Lassen indicated to St. John that they were going to try to find his brother. (Ex. 3.) St. John continued to volunteer information about his brother walking away. (Ex. 3.) Trooper Lassen took St. John to the back of his truck and began asking him questions about his brother. (TR. 77-78.) Trooper Lassen testified that he asked these questions because St. John indicated he was going to jail for his brother and Trooper Lassen wanted to identify the brother to determine whether the substance in the truck belonged to him. (TR. 77-78.)

At this point, Trooper Lassen was going to put St. John in his cruiser, but St. John asked not to be placed in the cruiser. (Ex. 3.) Trooper Lassen allowed St. John to sit on the back bumper of his truck. (Ex. 3.) Trooper Lassen went to retrieve the bag from the truck and brought it back for St. John to see. (Ex. 3.) St. John indicated he had never seen the bag before. (Ex. 3.) Trooper Lassen again asked about St. John's brother and where he went. (Ex. 3.)

Trooper Lassen then conducted a field-test on the substance and the test was positive for methamphetamine. (TR. 79.) Trooper Lassen testified that St. John was under arrest at this point and told St. John he was under arrest. (TR. 79; Ex. 3.) Trooper Lassen informed St. John he did not want to waste another officer's time looking for someone who did not exist. (Ex. 3.) St. John again indicated his brother did exist but had left on foot. (Ex. 3.)

Following St. John's arrest, Trooper Lassen continued to search the truck and located a cell phone. (TR. 80.) St. John told Trooper Lassen that he did not want him to go through the contacts on his phone and that he wanted it shut-off. (TR. 80.) St. John wanted to watch the phone being turned-off and indicated to Trooper Lassen that he had the right to do so. (Ex. 3.) Trooper Lassen powered-off the phone in front of St. John. (Ex. 3.)

Trooper Lassen called Nebraska State Patrol Trooper Michael Knuth ("Trooper Knuth") for assistance at approximately 5:30 p.m. (TR. 95.) When Trooper Knuth arrived on scene, Trooper Lassen told him that he had found methamphetamine in the truck. (TR. 95.) Trooper Lassen asked Trooper Knuth to locate the individual who St John referred to as his brother. (TR. 96-96.) Trooper Knuth drove towards Wood River to look for St. John's brother and then called

Trooper Lassen for more information. (TR. 96-97; Ex. 3.) Trooper Lassen asked St. John what his brother was wearing. (TR. 81; Ex. 3.) St. John provided a description of the brother to Trooper Lassen who relayed the description to Trooper Knuth. (TR. 81; TR. 95-96; Ex. 3.) Trooper Lassen testified that the purpose of this question to St. John was to locate the brother. (TR. 81.) St. John asked Trooper Lassen if there was something he could do to help himself so he would not go to jail. (TR. 83.) Trooper Lassen testified that he told St. John there was not. (TR. 84.)

While St. John was in the cruiser, Trooper Lassen asked him about a weed pipe found in the truck during the search. (TR. 82.) Trooper Lassen testified he asked this question to see if St. John would claim the pipe belonged to his brother. (TR. 82.) Trooper Lassen did not read St. John his *Miranda* rights at any point during their encounter. (TR. 78.)

Trooper Knuth located an individual matching the description given by Trooper Lassen inside a Subway shop. (TR. 96-97.) This individual was later identified as Naslund. (TR. 97.) When Naslund exited the Subway shop, Trooper Knuth asked him to stop and provide his information. (TR. 99.) Trooper Knuth testified that he got the impression Naslund did not want to speak to him because Naslund kept pacing back and forth and did not want to answer questions. (TR. 99; Ex. 4.) Naslund told Trooper Knuth that he did not have any identification. (TR. 99.) Naslund then told Trooper Knuth that he wanted to go back into the Subway to get a napkin. (TR. 100; Ex. 4.) Trooper Knuth testified that, at that point, he told Naslund that he was being detained and that he was going to be searched for weapons. (TR. 100; Ex. 4.) Trooper Knuth stated that as he put his notepad on his cruiser, Naslund fled on foot. (TR. 100; Ex. 4.) Trooper Knuth instructed Naslund to stop and get on the ground, but Naslund did not comply. (TR. 101.) Trooper Knuth caught-up to Naslund and tackled him on Highway 30. (TR. 101.) Naslund was able to get up and run away, but Trooper Knuth caught-up to him along a fence line. (TR. 101.) Naslund surrendered when Trooper Knuth threatened to tase him. (TR. 101.) Naslund was then handcuffed and Trooper Knuth found methamphetamine in his pocket. (TR. 108.)

Naslund sustained some abrasions on his hands and wrists when Trooper Knuth tackled him. (TR. 102.) He also had a limp. (TR. 103.) When he was apprehended, Naslund told Trooper Knuth that he could not breathe. (TR. 102.) Trooper Knuth testified that Naslund was alert and did not appear to be under the influence of a controlled substance at the time he was apprehended.

4

(TR. 102; TR. 107.) Trooper Knuth further stated that Naslund seemed to understand what was happening and was able to follow directions. (TR. 107.)

Naslund was examined by a volunteer firefighter while on scene. (TR. 103.) Trooper Knuth also called EMS. (TR. 103.) Trooper Knuth stated it is standard protocol to call EMS if someone is injured while in Nebraska State Patrol custody. (TR. 109.) While on scene, Naslund asked to speak to Nebraska State Patrol narcotics investigator, Jason Bauer ("Investigator Bauer"). (TR. 6; TR. 104.) Naslund had been an informant for Investigator Bauer. (TR. 32.) Nebraska State Patrol Sergeant Mike Korte, who had arrived on scene, called Investigator Bauer and Naslund was able to speak to him on speakerphone. (TR. 7; TR. 103-04.) Investigator Bauer testified that during the phone call, he did not make any promises or threats to get Naslund to talk to him. (TR. 33.)

Trooper Knuth then transported Naslund to the Hall County Jail in Grand Island, Nebraska. (TR. 104.) During the transport, Naslund asked Trooper Knuth about speaking to an investigator and doing "active" work, but Trooper Knuth did not speak to Naslund about that or Naslund's other activities because he does not know anything about the process. (TR. 105-06.) When they arrived at the jail, Trooper Knuth was directed by jail personnel to transport Naslund to the hospital to be medically cleared. (TR. 105-06.) Trooper Knuth took Naslund to the hospital. (TR. 106.) While on the way, Trooper Knuth did not ask Naslund any questions about the drugs or his activities. (TR. 106.) Trooper Knuth testified that he did not make Naslund any promises or threats to induce him to speak. (TR. 106-07.)

Trooper Lassen transported St. John to Hall County jail. (TR. 86.) During transport, Trooper Lassen told St. John that an investigator might try to come talk to him at the jail, unless St. John did not want to speak to the investigator. (TR. 86-87.) Trooper Lassen testified that it is not unusual for him to tell arrestees that an investigator might come to talk to them in felony drug cases. (TR. 87.) St. John told Trooper Lassen that he had sustained a work-related injury and was talking prescribed medications. (TR. 88; Ex. 3.) Trooper Lassen testified that St. John did not appear to be impaired or physically ill and seemed to understand where he was and what was happening. (TR. 89-90.) Trooper Lassen further testified that St. John answered questions appropriately. (TR. 90.) Trooper Lassen stated he did not make any promises or threats to induce St. John to speak to investigators. (TR. 90.)

5

At approximately 8:20 p.m., Investigator Bauer and Trooper Lassen conducted a recorded interview with St. John at the jail. (TR. 8; TR. 10; Ex.1.) At the time of the interview, Investigator Bauer did not know if St. John was interested in speaking to him. (TR. 10.) Investigator Bauer was aware St. John had a criminal record. (TR. 10.) Investigator Bauer testified that during the interview, he was initially trying to build a rapport with St. John. (TR. 12-13.)

The recording of the interview shows that Investigator Bauer told St. John that he knew a lot about him, including where he lived, his vehicle, his acquaintances, and that investigators had conducted surveillance on his house. (TR. 13; Ex. 1.) Investigator Bauer testified his goal was to get St. John to understand investigators had criminal cases against him. (TR. 13.) Investigator Bauer told St. John that "he was a nobody." (Ex. 1.) Investigator Bauer testified that he made this statement because he wanted St. John to understand that he was a "smaller fish" in the drug organization and that he was trying to get the "bigger fish," his supplier, in the drug organization. (TR. 14.) St. John told Investigator Bauer that he was willing to tell him some things. (TR. 14.) Investigator Bauer testified that based on St. John's responses, he understood that St. John was willing to speak to him. (TR. 14.)

St. John told Investigator Bauer that he did not want anything written down or on public record because he did not want to be a snitch and was afraid. (TR. 16.) St. John also told investigators that he did not want his name on any paperwork. (Ex. 1.) Investigator Bauer testified that he understood from St. John's statements that he was willing to talk but did not want to cooperate in being an informant. (TR. 16.) Investigator then told St. John that he was going to be given *Miranda* warnings and that questioning would pertain to his case, but that information provided may also be used in other investigations. (TR. 20; Ex. 1.)

Before reading St. John his *Miranda* rights, Investigator Bauer did not ask St. John about his methamphetamine dealings or take any written notes. (TR. 24; TR. 45; Ex. 1.) St. John did respond to statements made by Investigator Bauer prior to being read his *Miranda* rights, but Investigator Bauer did not ask St. John for specific details regarding these statements. (Ex. 1.) Investigator Bauer testified that he did not intend to ask St. John incriminating questions, read him

6

his rights, and then re-ask the same incriminating questions.[2] (TR. 25.) St. John was advised of his rights and signed a *Miranda* form approximately thirteen-minutes into the interview.[3] (TR. 8; Ex. 7; Ex. 1.)

St. John can be seen in the video rubbing his neck and telling Investigator Bauer his head hurt. (TR. 22.) St. John was also at times fidgeting, scratching his head, and placing his arm up against the wall. (Ex. 1.) Investigator Bauer told St. John he thought he had used drugs within the last twenty-minutes. (TR. 42.) St. John denied using drugs but indicated he used drugs in the past. (Ex. 1.) At one point, Investigator Bauer called St. John a meth addict and St. John got very angry. (Ex. 1.) St. John told Investigator Bauer it was not "cool" to call him a meth addict because he was clean. (Ex. 1.) Investigator Bauer then indicated to St. John that he wanted to know how long St. John had been clean because he was a drug recognition expert. (Ex. 1 at 7:25.) St. John stated he had been clean since December 25, 2016. (Ex. 1; TR. 42.) This conversation occurred before St. John was Mirandized. (TR. 42; Ex. 1.)

Investigator Bauer testified that St. John did not appear to be under the influence of a controlled substance during the interview. (TR. 22; TR. 25.) Investigator Bauer acknowledged at the hearing that he told St. John he thought he had used drugs within the last twenty-minutes. (TR. 42.) Investigator Bauer explained he made this statement and the statement about being a drug recognition expert in order to build a rapport with St. John. (TR. 42-44.) St. John testified that, at that part of the interview, he was unsure whether St. John was going to be honest or if symptoms of drug use were going to start. (TR. 42-44.) Investigator Bauer testified that part of the reason he was trying to build a rapport with St. John was to assess whether he had used methamphetamine. (TR. 55.)

Investigator Bauer testified that St. John appeared to be capable of understanding what was happening and making decisions. (TR. 22; TR. 25.) Investigator Bauer stated that St. John's answers were responsive to the questions asked and that St. John appeared to understand where he

---

[2] The video of the interview reveals that Investigator Bauer was providing St. John information about the investigation so St. John was aware of the evidence investigators had against him.

[3] Exhibit 1 shows that Investigator Bauer indicated he needed to read St. John his *Miranda* rights at several points before *Miranda* warnings were given. Investigator Bauer's first reference to *Miranda* occurred two minutes and thirteen seconds after St. John entered the interview room.

was.  (TR. 27.)  Investigator Bauer testified that St. John appeared to have voluntarily agreed to speak to him.  (TR. 25.)  At no point did St. John express that he wanted to stop answering questions or ask for a lawyer.  (TR. 26-27.)  Investigator Bauer testified that no one made any threats or promises to induce St. John to speak.  (TR. 39.)  The interview ended at approximately 9:30 p.m.  (TR. 27; Ex. 1.)

At around 10:00 p.m., Investigator Bauer and Trooper Lassen conducted a recorded interview with Naslund at the Nebraska State Patrol office in Grand Island, Nebraska.  (TR. 29-30; Ex. 2.)  Another investigator who had worked with Naslund in the past participated in the interview by phone.  (TR. 30.)  Investigator Bauer testified that he understood from his earlier phone conversation with Naslund that Naslund wanted to speak to him.  (TR. 32.)  At the time Naslund was interviewed, Investigator Bauer was aware that Nalund was injured during his arrest and had gone to the hospital to be medically cleared.  (TR. 60.)  Investigator Bauer testified that Naslund's right hand was bandaged and he was barefoot during the interview.[4]  (TR. 61; Ex. 2.)  Investigator Bauer used a form to advise Naslund of his *Miranda* rights.  (TR. 29; Ex. 8.)  Naslund signed the form with his left hand, due to the bandages on his right hand, and answered the investigators' questions.  (TR. 29; Ex. 8.)

Naslund did not express that he wanted to stop answering questions and did not ask for a lawyer.  (TR. 37; Ex 2.)  Investigator Bauer testified that Naslund seemed to be speaking to him voluntarily.  (TR. 37.)  Investigator Bauer stated that Naslund did not appear to be under the influence of a controlled substance and seemed capable of making decisions and understanding what was going on around him.  (TR. 37-38.)  Investigator Bauer testified that Naslund's answers were responsive to his questions.  (TR. 39.)  Investigator Bauer stated that Naslund's demeanor during the interview was the same as it had been on previous occasions when they had worked with him as an informant.  (TR. 37-38.)  The interview lasted around fifty minutes.  (Ex. 2.)

---

[4] The video of Naslund's interview shows he actually had a tennis shoe on his right foot and his left foot was barefoot. (Ex. 2.)

8

## DISCUSSION

Defendants contend that the statements they made to law enforcement officials must be suppressed because the officers violated *Miranda* and their statements were involuntary.[5] *Miranda* warnings must be given prior to any "custodial interrogation," which includes "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980).

St. John contends that Trooper Lassen's roadside questioning violated his *Miranda* rights. St. John argues that this questioning was likely to elicit incriminating information because it was related to the identification of the other person in the truck after methamphetamine had been found in the truck. St. John argues that even though the investigators did not know this at the time, this case has been charged as a conspiracy which further evidences the incriminating nature of the information. St. John's argument is unpersuasive.

It is apparent from the video of Trooper Lassen's interaction with St. John that the questions were not designed to elicit incriminating information regarding his possession of the methamphetamine or St. John's alleged drug dealings.[6] Rather, Trooper Lassen was trying to identify St. John's "brother." Trooper Lassen testified that he wanted to locate the brother in order to determine who the methamphetamine belong to, particularly because St. John indicated he was going to jail for his brother. There is no indication that Trooper Lassen threatened St. John or made any promises to induce St. John to speak. Although St. John asked Trooper Lassen if there was anything he could do to prevent going to jail, Trooper Lassen testified that he never told St. John that he would not go to jail if he continued to answer questions. Moreover, when Trooper Lassen transported St. John to jail, Trooper Lassen told St. John that an investigator might try to come talk to him but indicated to St. John that he did not have to talk to him.

---

[5] Defendants are not challenging the legality of their initial contacts with law enforcement, the searches, or their arrests.

[6] Trooper Lassen did ask St. John about a weed pipe located in the truck. However, the government has stipulated that it will not use St. John's response to Trooper Lassen's question about the weed pipe in its case-in-chief. (TR. 112.) Therefore, the admissibility of this statement will not be addressed in this Findings and Recommendation.

St. John and Naslund each argue that the statements they made after being advised of their *Miranda* rights were involuntary and therefore inadmissible. The determination of whether a defendant knowingly and voluntarily waived *Miranda* is "an extremely fact sensitive analysis." United States v. Nguyen, 608 F.3d 368, 374 (8th Cir. 2010). "A statement is not voluntary if the totality of the circumstances shows the defendant's will was overborne." United States v. Annis, 446 F.3d 852, 855 (8th Cir. 2006). Courts consider "the conduct of the officers and the characteristics of the accused . . . in determining whether a suspect's waiver or statements were the product of an overborne will." United States v. Daniels, 775 F.3d 1001, 1004 (8th Cir. 2014) (quotation omitted). Considerations include "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Id*. at 1004-05.

The evidence shows that St. John spoke to investigators knowingly and voluntarily. It is apparent from the recording of Trooper Lassen's roadside interaction with St. John that St. John understood his rights and knew how to exercise them. St. John consented to the search of his person and truck, but then refused to allow Trooper Lassen to examine his phone saying "it was his right" to refuse. Later, during the interview with Investigator Bauer, St. John indicated he did not mind speaking to investigators but did not want his name on any paperwork. These actions show that St. John retained the ability to make decisions, understood what was going on, and made a deliberate and voluntary choice to speak to investigators.

Although St. John stated during the interview that he did not feel well, nothing indicates that St. John had any physical or mental impairment which rendered him incapable of making informed decisions or of invoking his right to remain silent. The interview was short in duration and at no time did St. John express that he wanted to stop answering questions, ask for a lawyer, or state that he needed medical attention. St. John argues he was under the influence of drugs but St. John stated several times during the interview that he was not on drugs. Moreover, St. John was forty-three years old at the time of the interview and has an extensive criminal history. (Ex. 5.) St John's age and experience with law enforcement lends further support to the finding that his agreement to speak to investigators was voluntary. There is no indication that St. John's statements were the product of an overborne will.

Naslund's agreement to speak to investigators was likewise made knowingly and voluntarily. In fact, Naslund initiated his conversation with investigators. At the time of his arrest, Naslund asked to speak to Investigator Bauer on the phone and was permitted to do so.[7] Later that evening, Naslund was Mirandized and interviewed by Bauer. The interview was short in duration and at no point did he state that he did not want to answer questions or request an attorney. Further, there is no indication that there were promises or threats made to induce Naslund to speak. Naslund has an extensive criminal history and past-experience with Investigator Bauer. (Ex. 6.) Naslund's will was not overborne as to render his statements involuntary.

Although Naslund sustained injuries during his arrest, there is no evidence that these injuries prevented him from making a voluntary and informed decision to speak to investigators. Naslund was taken to the hospital and medically cleared. Even though methamphetamine was found on his person during arrest, there is no indication that Naslund was impaired or had actually used the methamphetamine prior to his arrest. Naslund understood what was going on and answered questions appropriately. Investigator Bauer testified that Naslund's demeanor during the interview was the same as it had been on previous occasions when they had spoken to him and worked with him. In short, there is no evidence that Naslund did not have the physical, mental or emotional wherewithal to exercise his rights, nor is there any indication that Naslund was not in a condition to understand the consequences of his agreement to speak to investigators or voluntarily confess. Further, Nasuland has an extensive criminal history which lends further support to the finding that his agreement to speak to investigators was voluntary.

The government has stipulated that it will not use any statements St. John made in the interview room before being given *Miranda* warnings in its case-in-chief. (TR. 122.) However, St. John argues that the pre-*Miranda* questioning tainted the statements that followed. St. John contends that investigators used coercive tactics to get him to answer questions during the initial part of the interview, read him his rights, and then re-asked him the questions following his rights advisement.

---

[7] The government has stipulated that it will not use the information learned during this telephone call in its case-in-chief. The government has further stipulated that it will not use any statements St. John made in the interview room before being given *Miranda* warnings in its case-in-chief. (TR. 114.) Therefore, the admissibility of these statements will not be addressed in this Findings and Recommendation.

11

It is well-established that investigators may use a variety of interrogation techniques to elicit information, which includes building a rapport with an arrestee. *See United States v. Plumman*, 409 F.3d 919, 924 (8th Cir. 2005) (finding interviewee's statement voluntary where the investigator "used permissible small talk and rapport-building techniques to make [the interviewee] more comfortable with the difficult subject matter and to gain [the interviewee's] trust and goodwill"); *United States v. Astello*, 241 F.3d 965, 967-68 (8th Cir. 2001) (finding the defendant's statements voluntary despite investigators' use of interrogation tactics). The Eighth Circuit has recognized:

> [O]fficers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices. None of these tactics render a confession involuntary, however, unless the overall impact of the interrogation caused the defendant's will to be overborne.

*United States v. Brave Heart*, 397 F.3d 1035, 1041 (8th Cir. 2005) (internal citations and quotations omitted).

The recordings of the encounters with each Defendant show that the investigators' interactions where conversational and nonconfrontational. Investigator Bauer told St. John that he knew a lot about him, including where he lived, his vehicle, his acquaintances, and that investigators had conducted surveillance on his house. However, Investigator Bauer testified that he was attempting to build a rapport with St. John. Investigator Bauer stated that he wanted St. John to understand that he had criminal cases against him and was attempting to locate the actual source of the drug supply. These interview techniques were lawful and, as explained above, the evidence shows that St. John's will was not overborne as to render his statements involuntary.

If an officer questions a suspect and deliberately delays providing *Miranda* warnings to obtain a confession, statements made after the warnings are inadmissible. *United States v. Torres-Lona*, 491 F.3d 750, 757-58 (8th Cir. 2007) (citing *Missouri v. Seibert*, 542 U.S. 600, 622 (2004). However, "[w]here there has been no such calculated effort," the post-warning statements are admissible where the defendant knowingly waived his rights. *United States v. Wise*, 588 F.3d 531, 536 (8th Cir. 2009) (internal quotation omitted). The question is whether "a reasonable person in the suspect's shoes would have understood the *Miranda* warnings as conveying a message that the

suspect retained a genuine choice about continuing to talk." *United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005) (internal quotation omitted).

Here, there is no evidence that the investigators deliberately delayed providing *Miranda* warnings. There is no evidence that the investigators' interview techniques were calculated to circumvent *Miranda*. The record does not reveal that there was a "police strategy adapted to undermine the *Miranda* warnings" or indicate that the non-Mirandized questioning "was systematic, exhaustive, and managed with psychological skill." *Seibert*, 542 U.S. at 616. St. John was provided *Miranda* warnings and signed a waiver form approximately thirteen-minutes into the interview. The questioning performed by investigators prior to the *Miranda* advisement focused on building a rapport with St. John. Investigators did not ask St. John specific, direct questions about his case before reading him his rights. Investigators did not confront St. John in the post-*Miranda* questioning about any of his pre-*Miranda* statements. Moreover, post-*Miranda*, investigators did not systemically re-ask the questions posed to St. John before the *Miranda* advisement.

Just before providing St. John his *Miranda* advisement, Investigator Bauer told St. John that questioning would pertain to his case, but that information provided may also be used in other investigations. Despite this, St. John did not refuse to answer additional questions. A reasonable person would have understood that he retained a genuine choice about continuing to talk.

Accordingly,

**IT IS HEREBY RECOMMENDED** to Chief United States District Court Judge John Gerrard that the motions to suppress (Filing Nos. 25 and 27) be denied.

Dated this 20th day of December, 2019.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.